WILLIAM C. KAUFMAN

*v.*

MARY R. EDWARDS.

EDWARD C. STOKES, special administrator, &c.,

*v.*

MARY R. EDWARDS et al.

[Decided March 28th, 1921.]

1. Where moneys belonging to A are by A deposited in bank in an account in the name of "A or B, payable to either or the survivor," such action is sufficient to accomplish a transfer to B of an interest in such bank credit, if it appear that A intended thereby to effectuate a then present transfer of such interest.

2. In such a case, whether or not A had such intent thereby to accomplish a then present transfer to B of an interest in the bank credit, and if so, the nature and extent of the interest so intended to be transferred, is to be determined from all the evidence.

3. In such a case, if A's intent was to accomplish a then presently effective transfer of an interest in remainder at A's death in such bank credit—though conditioned upon B surviving A, and subject to A's right to diminish the bank credit during his lifetime—the transfer is valid; but if A's intent be that no transfer of interest take place until A's death, no valid transfer results either at the time of the opening of the account, the depositing of the moneys or the death of A leaving B surviving.

4. Where both A and B open a deposit account in the name of "A or B, payable to either or the survivor," and each deposits moneys of his own in said account, it merely presents the same question in a double form—*i. e.*, whether A intended a present transfer to B of an interest in the bank credit represented by the moneys deposited by A (and if so, what interest), and whether B intended a present transfer to A of an interest in the bank credit represented by the moneys deposited by B (and if so, what interest).

5. A and B opened a bank account in the name of "A or B, payable to either or the survivor," and both from time to time made deposits therein of their own respective moneys. Occasional withdrawals were

made by A, or for A's benefit, but at A's death, leaving B surviving, the bank credit was still in excess of the sums (and interest) deposited by B.—*Held,* that B is entitled to the entire bank credit as against A's administrator; that as to the portion thereof represented by A's deposits it appeared from all the evidence that A's intent in the opening of the account and making the deposits had been to effectuate a then present transfer to B of an interest in the credit resulting from such deposits, which interest was at least an interest in remainder at A's death therein, conditional upon B's surviving A and subject to A's right of withdrawal in the meantime—and that such transfer was valid and effectual; that as to the portion represented by B's deposits, even if B had had a similar converse intent, nevertheless, the transfer to A was rendered nugatory because A did not survive B.

On bill, &c.  On final hearing.

*Messrs. Scammell & Besore,* for Edward C. Stokes, special administrator, &c.

*Mr. Maxwell A. Kraemer,* for William C. Kaufman and John A. Kaufman.

*Mr. Harvey T. Satterthwaite,* for Emma Velder.

*Mr. Edwin C. Long,* for Mary R. Edwards.

*Mr. Walter F. Hayhurst,* for the Lambertville National Bank.

BUCHANAN, V. C.

These two cases require the determination of the ownership of a certain bank credit of upwards of $5,700, standing in the name of "Mary Kaufman or Mary R. Kaufman, payable to either or the survivor."

Mary R. Kaufman married subsequent to the opening of the account and is now Mary R. Edwards. Mary Kaufman is dead—dying domiciled in Pennsylvania—and Edward C. Stokes is special administrator for the collection of assets of her estate in New Jersey.

In the bill filed by William C. Kaufman against his sister Mrs. Edwards claim was made by him to one-fourth of the de-

posit, under an alleged trust for Mrs. Kaufman to Mrs. Edwards for the benefit of four children. The bill subsequently filed by Mr. Stokes, as special administrator, against Mrs. Edwards joined the other three children as defendants (as well as the bank), and they filed answers setting up the same claim as made by William in his bill. The two causes were then consolidated and the whole matter came on for hearing at one time.

Cases involving the ownership of so-called "joint" bank accounts of this kind—that is, where the pass-book or deposit-book shows the account as of the bank "in account with A or B or the survivor," or to similar effect—have frequently come before the courts of this state and other states. In almost every instance, however, these cases have been cases where the moneys deposited in the account have all been deposited by one of the two persons interested, and that person (who may be, and frequently is, termed the "donor") has died, and the other of the two persons, or "donee," has claimed the account as against the executors or administrators of the "donor." The present case is therefore unique, in that moneys were deposited in the account by both parties, and of the amount on deposit in the account at the "donor's" death (exclusive of interest), the major part thereof had been deposited therein by the "donee."

In cases of this kind—as, indeed, in all cases of attempted transfer of bank credits—there are two matters which are the subject of inquiry—one being the intent of the "donor" and the other being the act by which such intent has been sought to be effectuated.

As to intent, the inquiry is, Was there at the time of the act an intent to make a then presently operating transfer of the "donor's" right against the bank or other depositary? (In many of the cases this intent is called a "donative purpose," but it is of course obvious that the inquiry is equally pertinent and necessary where there may have been consideration for the transfer as where the case is one of pure gift.)

As to the act, the inquiry is as to whether the method employed for the attempted transfer is legally sufficient to accomplish such transfer, assuming the existence of the requisite intent.

In these cases of accounts to the credit of A or B, payable to either or the survivor, the act of alleged attempted transfer is the making of the contract between the depositor and the bank —the transferee may or may not be also a party to this contract. That contract—at any rate where the transferee is not an actual party to it—in its expressed terms is a contract whereby A loans money to the bank and the bank promises to pay to either A or B, according to their respective demand or order, or to the survivor of them. This provision as to payment by the bank is both an obligation and a right. The bank is bound to make such payments, and, on the other hand, moneys paid by it to B or on B's order will discharge it *pro tanto* of liability to A. But, clearly, there is nothing expressed or implied in that contract which necessarily accomplishes a transfer of *ownership* in the chose in action. On its face it may deal only with transfer of possession instead of ownership. A may go to B, a merchant, purchase and pay for an article, with an agreement as part of the contract of purchase and sale, that B shall keep the article to be delivered to C upon his calling for it. C may be a mere agent of A to receive possession for A of the article which A has purchased for himself and therefore owns, or A may have purchased the article for C, either as a gift or pursuant to contract between A and C, and in that case the delivery to C would be a transfer of ownership as well as possession.

Assuming, therefore, for the moment, that the means employed by Mrs. Kaufman, in the present case—*i. e.,* the making of this contract of "joint account" with the bank—was sufficient to accomplish a transfer of the chose in action or some interest therein, as effectively as a formal written instrument of assignment, the necessity of ascertaining her intent is plain. Did she intend it to operate merely in the nature of a power of attorney to Mrs. Edwards, or did she intend thereby then presently to transfer to Mrs. Edwards the actual ownership of some interest in that chose in action (whether or not the actual enjoyment thereof by Mrs. Edwards should be immediate or deferred), and if the latter, what interest therein did she intend to convey?

Dealing, first, with the sufficiency of the alleged act of transfer, I conclude that the means employed by Mrs. Kaufman was sufficient to effectuate her purpose and intent, if she had the purpose of transferring an interest in the account.

This conclusion is based upon both reason and authority. The act of making such a contract with the bank is as much a *completed act* as the execution of a formal instrument of direct assignment or assignment in trust, or as a manual delivery.

That it is in itself ambiguous cannot matter—for the mere act alone of manual tradition is equally ambiguous as to whether it constitutes transfer of mere possession or of ownership—yet no one would contend that the manual delivery was an insufficient act to effectuate transfer of ownership if the requisite intent be present. Nor can the fact that the contract leaves Mrs. Kaufman with the power, or some power, of disposition of the debt due from the bank be of any controlling materiality. If A, being in partnership with B, takes some of his own money to the bank and opens an account in the name of "A and B, partners" (assuming, of course, the requisite intent), no one will contend that the "money in bank"—*i. e.*, the chose in action, of the bank's indebtedness—is not partnership property—that the act was not sufficient to accomplish a transfer merely because the transaction leaves A with a right to draw on the account.

That the conclusion reached is not only logical but settled law in this state is clear from a consideration of the adjudicated cases. Such is the decision in *Dunn* v. *Houghton*, 51 Atl. Rep. 71, and in *Schippers* v. *Kempkes*, 67 Atl. Rep. 1042; affirmed, 72 N. J. Eq. 948. Both of these cases are, I take it, expressly approved on this point in the recent opinion in *New Jersey Title, &c., Co.* v. *Archibald*, 108 Atl. Rep. 434. In the last-mentioned case, at the time the account was opened by the "donor," the "donee" was also present and both signed a written statement, delivered to the bank, "that this account and all moneys to be credited to it belongs to us as joint tenants and will be the absolute property of the survivor of us; either and the survivor to draw." It is held that there was a then present gift and delivery; the objections based on the right of the

"donor" to draw, and on the right of survivorship, are expressly refuted, and the "donee" is held entitled to the account on the "donor's" death. I am unable to perceive how the presence and participation of the "donee" at the time of the making of the contract with the bank can be of any materiality. They might merit consideration in the endeavor to ascertain the intent of the "donor," but not as to the legal sufficiency of the act of transfer —the contract between the "donor" and the bank. Neither is the explicit character of the written statement, which they both signed and delivered to the bank, material on that point. That written statement is merely proof that the "donor's" intent was that the opening of the account was an act of present transfer of interest instead of a "power of attorney." It supplies the proof necessary to resolve the ambiguity of the mere opening of the account alone—the proof which otherwise must needs have been sought from other sources. There is assuredly no indication in the opinion that any of these things in anywise contributed to the decision reached; rather does the contrary appear from the express approval of the opinions in *Dunn* v. *Houghton* and *Schippers* v. *Kempkes,* in neither of which were any of these factors present.

I take it to be the settled law of this state, therefore, that where a depositor opens a bank account in the names of "A or B, or the survivor," or the equivalent thereof, the "donee" takes an interest in the chose in action and will take the entire chose by survivorship at the death of the "donor," *if* the depositor had the intent then to transfer such interest. The many cases denying the "donee's" right are those where such intent was lacking or insufficiently proven. Such was the situation in *Morristown Trust Co.* v. *Capstick, 106 Atl. Rep. 391; affirmed, sub nom., Morristown Trust Co.* v. *Safford, 108 Atl. Rep. 926,* where there was no explicit contract such as in the *Archibald Case,* and the evidence as to the depositor's intent showed clearly that he had opened the account only for his convenience—for a "power of attorney" purpose—and had no intention of a then present transfer of interest to the "donee."

I have hereinbefore referred to the circumstance—unusual in these cases—that *both* parties to the account made deposits

therein of large amounts. This, however—while it ought by no means to be overlooked in the consideration of the facts and circumstances evidential as to intent—in nowise adds to, or subtracts from, the principles governing the determination of the suit. The result thereof is merely that we have to deal with a combination of two alleged or attempted transfers—the transfer by Mrs. Kaufman to Mrs. Edwards in respect to the moneys deposited by Mrs. Kaufman and the transfer by Mrs. Edwards to Mrs. Kaufman in respect to the moneys deposited by Mrs. Edwards. Whether or not a transfer was effectuated by Mrs. Edwards does not concern us in the present case; if it was, it was, nevertheless, subject to the condition of survivorship, and Mrs. Edwards gets it back as survivor; if it was not, then the moneys deposited by Mrs. Edwards enure to her credit alone.

Let us now turn to evidence from which is to be ascertained the intent of Mrs. Kaufman.

The account was opened November 9th, 1903. The pass-book and two cards constitute the only contract with the bank. The book is headed "Lambertville National Bank, Savings Department, in account with Mary Kauffman or Mary R. Kauffman, payable to either or the survivor," and then follows the entries of deposit and withdrawal. The two "signature cards" each bore the number of the pass-book and contained the following: "Agreement—I do hereby assent to the rules and regulations of the bank governing savings deposits as printed in my pass-book." Mrs. Kaufman signed one of these and Mrs. Edwards the other. The only portions of those rules and regulations which can be at all relevant are that the entries in the pass-book shall constitute the depositors' vouchers, and that all payments made to any person producing the pass-book shall be good and valid payment (not that the pass-book must be produced on withdrawals).

The principal witness was Mrs. Edwards. Complainants not only did not invoke the bar of the statute against her testifying as to conversations and dealings with the decedent, but the administrator himself called her for that purpose. Her testimony shows that the confidence was amply justified, for much of her testimony was against her own interest, although no one could have contradicted her.

It is evident that a somewhat unusual relationship of perfect trust, confidence and mutual interest existed between mother and daughter—as beautiful as it is rare. She was living with her mother, and, although of age and earning her own living, she turned over to her mother practically her entire earnings, which her mother deposited in an account in the Lambertville bank in her (the mother's) own name. On November 9th, 1903, this account comprised $500, made up in whole or in large part of the daughter's moneys. This $500 was transferred to the new "joint" account as the opening deposit.

The intent of the mother and daughter with regard to the moneys turned over and deposited in the first account was not only unexpressed but extremely vague and indefinite—*vide* the following testimony:

"*Q.* Well, why did you give your mother these moneys that you earned in New Hope; did you give them to her?

"*A.* I would take them home and just hand them to her; what I needed then I kept.

"*Q.* For what purpose did you hand them to her?

"*A.* Nothing was ever said.

"*Q.* What did you mean that she should·do with them?

"*A.* Just as she chose.

"*Q.* Did you mean to make a gift of those moneys to her?

"*A.* No; I gave everything to mamma, anyhow.

"*Q.* Were you giving these moneys to her, so that from and after the time you gave them to her, they should be her moneys to do as she chose with them, or did you give them to her for you?

"*A.* I knew she was keeping them for me."

Mrs. Edwards was not present when the new account was opened (she went daily to work in Philadelphia), but signed the signature card a little later. She says she knew her mother was going to open the joint account. At, or shortly after the joint account was opened, Mrs. Kaufman said to Mrs. Edwards that

"she was putting it in both our names so that I could get it after she was gone, or she could get it if anything happened to me; I think that was at Mr. Phillips' suggestion."

The president of the Lambertville bank (Mr. Phillips) testified that he could not recall whether or not he was present at the

actual opening of the account, but Mrs. Kaufman spoke to him several times about it subsequently.

"Mrs. Kauffman always said that that '[the money in the account] was for Mrs. Edwards.   *   *   *   It was to be Mrs. Edwards' after she, Mrs. Kauffman, was gone.   *   *   *   She wasn't versed much in banking accounts and she wished us to make sure that her daughter received the funds.   *   *   *   She wanted it put in that way so she could make sure her daughter would get it when she died.' "

It is perfectly obvious that the account was not opened in this way for the convenience of Mrs. Kaufman (as frequently appears in suits of this kind), for Mrs. Kaufman was in good health and active practically all the time until her death, in 1915, and, on the other hand, when the account was opened, and for some years thereafter, Mrs. Edwards spent the daytime at employment in Philadelphia. Later, when she secured employment near at home, either one would go to the bank, as happened to suit their mutual convenience. Both took money to the bank to deposit, and the moneys so taken by Mrs. Edwards might be her mother's, or her own, or partly both, and vice versa.

The production of the pass-book for withdrawals was not requisite—and, indeed, the intrinsic evidence of the entries of withdrawal shows that it was by no means always presented at withdrawals—but even if it had been required, it was kept at the home accessible to both, or either, and for a time in a safe deposit box accessible to either.

No account or record was kept by either of the two as to the respective moneys of each which went into the account, nor of withdrawals. Aside from the first deposit, the moneys contributed to the account by Mrs. Edwards (exclusive of interest) aggregated, as nearly as she could fix or estimate it, the sum of $2,600. Mrs. Kaufman, then (not taking into account a deposit of $2,000 in her hands as administratrix of her husband, inadvertently put into this account and then withdrawn) must have deposited about $2,700. She withdrew about $2,200, leaving only $500 of her deposits at the time of her death.

There were only ten withdrawals from the account, eight by checks signed by Mrs. Kaufman and two by checks signed by

Mrs. Edwards at Mrs. Kaufman's request, but all for the use, benefit or account of Mrs. Kaufman. An examination of the entries and balances in the pass-book, in the light of the testimony, shows that apparently at no time did the withdrawals by or for Mrs. Kaufman encroach upon the moneys which had been contributed by Mrs. Edwards, although this may perfectly well be mere accident and not design, since the withdrawals are so few and since no record was kept of their respective contributions. Some $1,400 or $1,500 of the withdrawals were given by Mrs. Kaufman to her other children.

Mrs. Edwards made no withdrawals for her own use or benefit. No occasion ever arose to require such a withdrawal. She said (on being pressed by me) that she felt she had a right to draw for her own use if she had wanted it—yet, again, she said, "I felt it wasn't mine until after she was gone, anyway." The nature and extent of her right and interest in the deposit account as between herself and her mother, was obviously very vague and indefinite in her mind; nothing like an expression thereof was ever had between them.

The only other evidence of any particular significance is that when Mrs. Kaufman was seriously ill, and both feared she would not recover, she suggested to Mrs. Edwards that the "joint account" should be divided (apparently upon her death) between Mrs. Edwards, Mrs. Velder, John Kaufman and William Kaufman, to which Mrs. Edwards said "All right." The next day Mrs. Kaufman was somewhat better and Mrs. Edwards said to her mother, "Did you want me to take mine out?" meaning to take from the account before the suggested distribution the amounts which Mrs. Edwards had contributed thereto of her own moneys, to which Mrs. Kaufman assented. Mrs. Edwards, being asked why she agreed to such a proposition, testified:

> "*A.* I assented to anything my mother wanted.
> "*Q.* Even to the extent of giving your savings to your brothers and sisters?
> "*A.* If my mother asked it."

Considering this incident in relation to the trust claimed by the brothers and sister (and there is no other evidence to sup-

port such claim), I think it is clear that no such trust arose. As to the contributions of Mrs. Edwards to the account, there was no consideration; as to the contributions of Mrs. Kaufman there was no completed trust, as in *Hoboken Bank* v. *Schwoon, 62 N. J. Eq. 503.* Such claim of trust is therefore disposed of adversely to the claimants.

I have no difficulty in determining that the intent of Mrs. Kaufman was not merely to accomplish a "power of attorney"— it was clearly an intent that Mrs. Edwards should be vested at some time with the beneficial interest in at least the unsatisfied balance of the chose in action which should remain at Mrs. Kaufman's death, conditioned upon Mrs. Edwards then surviving. The evidence, as has been seen, disproves the idea that the account was opened in the dual form for any reason of convenience to Mrs. Kaufman, and the testimony as to Mrs. Kaufman's statements clearly proves her desire that Mrs. Edwards should have the "funds" at her death.

This determination, however, does not, I take it, carry us quite far enough to be dispositive of the suit. I do not understand the court of errors and appeals to have overruled its decision in *Stevenson* v. *Earl, 65 N. J. Eq. 721,* by the opinion in *Guaranty Trust Co.* v. *Archibald, supra.* On the contrary, the opinion of that court in *Morristown Trust Co.* v. *Safford, supra,* was handed down on the same day as the opinion in the *Archibald Case,* and affirms the decree in this court expressly for the reasons stated in Vice-Chancellor Stevens' opinion, and the latter opinion expressly rests the decision there reached upon *Stevenson* v. *Earl.* In *Stevenson* v. *Earl* it is held that a deposit agreement between Earl and the depositary, by the terms of which the balance remaining to the credit of Earl at his death should be paid to his wife, was invalid to pass the ownership in such balance to the wife, as being a testamentary disposition and not conforming to the requisites of the statute of wills. Obviously, if what is done by a donor is a presently effective transfer of an interest, even if that interest be a remainder at donor's death, and conditioned upon donee's survival, there is no violation of the statute of wills, for the disposition is a present disposition and not a testamentary one. The interest vests

presently in the donee, though the enjoyment be only conditional and *in futuro* at the death of donor. This is not denied in the *Earl Case*—the opinion states that the disposition which is invalid as being a testamentary disposition is one where the agreement between donor and depositary is that the donor has complete right of ownership and control during his life, and that so much as shall remain at his death shall be delivered to donee, "who shall *then* become the owner thereof." (Page 725.)

Further inquiry, therefore, is necessary to determine whether Mrs. Kaufman's intent in this transaction was to make a present transfer vesting in Mrs. Edwards an interest even if enjoyment should be postponed till Mrs. Kaufman's death, or whether the intent was that at Mrs. Kaufman's death, and not until then, the intended beneficial ownership should pass to Mrs. Edwards. It is not necessary to decide whether Mrs. Kaufman intended that Mrs. Edwards should acquire more than a remainder interest coming into enjoyment at Mrs. Kaufman's death, but assuming that this was the extent of the "gift," it is very difficult, indeed, to determine whether that interest was presently transferred or intended to be transferred only at death. That difficulty of necessity must almost invariably exist in cases of this kind. Doubtless, it would be very helpful if a definite rule or principle one way or the other should be established by legislative enactment, so that parties might be definitely sure in advance as to how their intent in transactions of this kind would be interpreted, and could be sure whether or not an attempt to make a gift in this way would be held valid or invalid.

In the present case I am inclined to the opinion that the intent was of a present transfer and vesting of the right in remainder (and, probably, indeed, of a right in the entire chose during Mrs. Kaufman's life), from the fact of the indiscriminate mingling in the deposits of the contributions of both parties, and the keeping of no record by either as to the amounts respectively contributed. Such conduct, it seems to me, negatives the idea of the retention of separate interests and is compatible only with the idea and intent of a joint ownership in the mingled and indistinguishable assets, especially under the circumstances of close relationship and mutual trust existing between this

mother and daughter. The incident at the time of the mother's presumed mortal illness in nowise effectually militates against the conclusion—for the testimony shows only that it was a suggestion or request that the mother made as to the other children sharing; it does not go to the extent of evidencing a belief by the mother that she had the right to alter the disposition of the "fund."

It might be argued that the indistinguishable mingling of the funds is explainable by the fact that the later account was simply a continuation under the new names of the earlier account which had been in Mrs. Kaufman's name alone. But such an argument rather substantiates than disproves my conclusion—for the funds in the earlier account were contributed by both and mingled, and the change to the two names would rather evidence the intent by the mother that the daughter's actual interest in the account should be made a matter of record. As Mr. Phillips testified, "She wasn't much versed in banking accounts and she wished us to make sure that her daughter received the funds" (when she died). She, of course, had no solicitude except about what should occur after her death. She knew that while she lived there could be no question or difficulty arise between herself and her daughter, for it is clear from the evidence that what was hers was her daughter's and what was her daughter's was hers.

However, even if the scales balanced evenly upon the question of whether the intent was of present or future transfer, the result must be the same—for the complainant-administrator not only assumed, but had, the burden of proof on the issue raised. To prove his assertion that the chose was the property of Mrs. Kaufman at her death (upon which proposition his right to recover rests solely), he must prove either (1) that the intent was not of gift at all but of convenience (and as to this the proofs are all against him), or (2) that the intent, if of gift, was of future gift and not present gift.

I will advise a decree adjudicating the right of Mrs. Edwards to the entire account and dismissing both bills. Mrs. Edwards is entitled to costs as against both complainants; I think no other costs should be awarded.

It was stated to me toward the close of the hearing that a settlement had been arrived at between Mrs. Edwards and her brothers and sister. Upon my inquiring as to the terms of such settlement, however, it was apparent that the respective counsel were not in accord in regard thereto. In view of this, and inasmuch as I have not otherwise been apprised thereof, and the same has not been made to appear of record, I am compelled to disregard the intimation of such settlement.